*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH MCCOY, CINDY MCCOY, JAMES
SCHNEIDER, and SHIRLEY SCHNEIDER,

UNPUBLISHED
June 05, 2026
1:09 PM

Plaintiffs/Counterdefendants-
Appellees,

v

No. 370166
Sanilac Circuit Court
LC No. 2020-038734-CH

JEFF WALBY,

Defendant/Counterplaintiff-Appellant.

Before: GADOLA, C.J., and REDFORD and RICK, JJ.

PER CURIAM.

Defendant/counterplaintiff, Jeff Walby, appeals as of right the trial court's order of final judgment in favor of plaintiffs/counterdefendants, Joseph McCoy, Cindy McCoy,[1] James Schneider, and Shirley Schneider.[2] On appeal, Walby challenges several lower court orders related to property located in Sanilac County. Walby and plaintiffs own property within the Charlen Subdivision, a private plat located in Delaware Township, Sanilac County, Michigan. Walby challenges a September 2020 preliminary injunction that permitted plaintiffs to install waterlines along a private right of way, rather than using the private easements that ran along the north and south borders of the Charlen Subdivision. Walby also challenges the trial court's October 2022 order granting summary disposition to plaintiffs, which converted the preliminary injunction into a permanent injunction. Lastly, Walby challenges the March 20, 2024 order finding no cause of

---

[1] Cindy McCoy passed away during the lower court proceedings. At a status conference on February 3, 2023, the court and the parties all agreed that Cindy McCoy would be removed from the case by stipulation of the parties, but this did not happen.

[2] Joseph and Cindy McCoy will be referred to collectively as the McCoys. Similarly, James and Shirley Schneider will be referred to collectively as the Schneiders.

-1-

action on Walby's counterclaim for damages that he allegedly suffered as a result of the negligent installation of the water lines.  For the reasons set forth below, we affirm.

## I.  GENERAL FACTUAL BACKGROUND AND PROCEEDINGS

The Charlen Subdivision, a private plat, was dedicated in 1956 and consists of 20 individual lots and a private park that overlooks Lake Huron.  A public roadway, now known as Lakeshore Drive or M-25 (hereinafter M-25), borders the subdivision on the west; Lake Huron borders the subdivision on the east.  There are two private roadways in the private subdivision, Charlen Drive and Florence Court, that intersect at a "T."  Charlen Drive is 66 feet wide, but the drivable portion of Charlen Drive is only approximately 10 feet wide.  The parties frequently referred to the drivable portion as "Charlen Drive" and the 28 feet on either side of the "drive" as the "right of way."  Charlen Drive runs east and west and was described as more than "three football fields long."  Charlen Drive dead-ends at Florence Court, a road that runs north and south on the east end of the subdivision.  Charlen Drive and Florence Court are not owned by any individual property owner.  Instead, they are considered community property for the benefit of the subdivision lot owners.

The plat has a private park overlooking Lake Huron, and Lots 1 through 5 are situated behind the park on Florence Court.  Further, running along most of the north and south borders of the subdivision are 6-foot-wide private easements.  These easements run parallel to Charlen Drive and similar to Charlen Drive, they end at Florence Court:



The parties to this appeal are the only property owners in the Charlen Subdivision.  In 1987, Walby purchased Lot 4 within the subdivision.  In July 2011, he purchased a portion of Lot 5, Lots 6 through 8, and Lots 10 through 20.  In October 2002, the Schneiders purchased the remaining portion of Lot 5.  In September 2016, the McCoys purchased Lots 1, 2, and 3.  Later, the McCoys bought Lot 9.  Accordingly, Walby owns 15½ lots in the subdivision, which accounts for 90 percent of the land.  The Schneiders, the McCoys, and Walby each own a residence on Florence Court that overlooks the park and Lake Huron.  In addition, Walby has a green house, a guest house, and a pole barn spread out over his various lots.

Historically, water was supplied to the homes within the Charlen Subdivision through individual beach wells.  Years ago, municipal water access taps were installed along M-25 to permit property owners to tap into the municipal water system.  The Schneiders, Walby, and presumably the McCoys' predecessor were assessed a sum to access the water system.  However,

at the time, none of the residents in the subdivision elected to connect with the municipal water supply.

In 2013, Walby, without notifying any of the other property owners, installed a water line between his guest house and his green house by trenching across Charlen Drive. These water lines were sourced by Walby's lake well. At some point, Walby also trenched under the private roads to install an electrical line between his pole barn and his guesthouse.

In 2019, the McCoys' water pump failed and, as a consequence, they did not have access to safe, clean, and sanitary water. In recent years, the Schneiders had faced similar issues with their well pump. Accordingly, in November 2019, the Schneiders and McCoys hired Mark Schweitzer to connect their two homes to the municipal water supply. The water lines would have been installed underground and adjacent to the existing 10-foot private road within the 66-foot-wide Charlen Drive right of way. Walby objected to the installation of the water lines in this manner, asserting that any water lines had to be installed within the 6-foot private easements located on the north and south borders of the subdivision.

On November 4, 2019, Schweitzer began to excavate along the southwest end of Charlen Drive. In an effort to halt the project, Walby parked his pickup truck in a manner that impeded Schweitzer's forward progress. Unsure what to do, Joseph McCoy called the police. The police arrived and concluded that the parties' dispute was a civil matter. At some point, Schweitzer backfilled the trench and stopped for the day.

James Schneider investigated the feasibility of installing the water lines within either the north or south 6-foot private easements. For several reasons, the Schneiders and McCoys concluded that installing the water lines in the private easements was not a viable solution. First, they learned that the 6-foot easements that ran parallel to Charlen Drive to the north and the south did not extend across Florence Court to plaintiffs' homes. Second, there already existed electrical utility lines and poles within the private easement to the south. In this regard, DTE Energy informed plaintiffs that water lines should not be installed within the south easement because they would be too close to the electrical lines.

On June 24, 2020, plaintiffs filed a complaint for injunctive relief. In Count I, plaintiffs requested that the court issue a temporary restraining order and a preliminary injunction, precluding Walby from interfering with plaintiffs' installation of water lines necessary to connect their homes to the municipal water taps located at M-25, at the west end of the Charlen Subdivision. In Count II, plaintiffs sought a declaration that plaintiffs could install underground water lines in the Charlen Drive right of way and that Walby was precluded from interfering in plaintiffs' efforts to connect their homes to the municipal water taps. Lastly, in Count III, plaintiffs requested that the court declare a utility easement by necessity to allow plaintiffs to access municipal water by installing water lines underneath Charlen Drive and Florence Court. Concurrent with the filing of the complaint, plaintiffs filed an ex parte motion for a temporary restraining order. Plaintiffs argued, among other things, that they would likely prevail in their request for injunctive relief.

On June 24, 2020, the trial court entered a temporary restraining order enjoining Walby from disrupting plaintiffs' contractor "from installing the water lines within the 66-foot wide

private drive known as Charlen Drive and under Florence Court to plaintiffs' residences." The court also ordered that Walby appear at a July 2020 hearing to show cause why a preliminary injunction should not issue.

On June 29, 2020, Schweitzer installed the water lines along the southern portion of the Charlen Drive right of way and across Florence Court to plaintiffs' homes, allowing them access to the municipal water supply. Unfortunately the installation of the water lines did not go smoothly. Walby was present during the entire process taking pictures to document the installation. A sheriff's deputy was onsite for the entire 12 hours it took to install the lines. While digging the trench, Schweitzer inadvertently cut Walby's private water supply line in at least one place and an unmarked electrical line that Walby installed under the private roads.

Walby filed an answer to plaintiffs' complaint in July 2020. In addition to his answer, Walby filed a two-page counterclaim alleging that plaintiffs' contractor negligently installed plaintiffs' water lines and, as a consequence, the contractor damaged an existing drain tile under Charlen Drive, Walby's private water line (in two places), and Walby's existing underground electrical line. Walby also asserted that during the excavating and trenching, the contractor substantially damaged the surface of Charlen Drive's private road.

The court held an evidentiary hearing on the temporary restraining order in August and September 2020. At the conclusion of the hearing, the court granted plaintiffs the requested preliminary injunction. The court found persuasive plaintiffs' position that it was not feasible to run the water lines from the north or south easements because the easements did not reach plaintiffs' property. Further, the court noted that there were electrical poles on the south easement and "Detroit Edison" had informed plaintiffs, through their contractor, that water lines could not be installed within 10 feet of the electrical poles. The court also found that Walby came before the court with unclean hands.

In the months that followed, the parties participated in court-ordered facilitation, which did not settle the case. In September 2021, the court ordered the parties to submit briefs to narrow the issues and determine if the case could be settled without a trial. In their brief, plaintiffs sought summary disposition of their claims under MCR 2.116(C)(10) and entry of a permanent injunction. A year later, in October 2022, the court granted summary disposition to plaintiffs on Counts I and II of their complaint. Regarding Walby's counterclaim, the trial court denied plaintiffs' request for summary disposition and further provided that "the remaining issue left for trial or an evidentiary hearing in this matter solely relates to any damages any party may be entitled to following the installation of the water lines."

The court held a bench trial in August and September 2023. At the conclusion of the three-day trial, the court found that Walby failed to establish that Schweitzer, plaintiffs' contractor, negligently performed the water line installation or that any alleged negligence was a proximate cause of any damages. On March 11, 2024, the court entered a final judgment finding no cause of action on Walby's counterclaim. This appeal followed.

## II. ANALYSIS OF THE ISSUES

## A. SUMMARY DISPOSITION-COUNT II

Walby argues that the trial court erred when it granted plaintiffs summary disposition and entered an order converting the preliminary injunction into a permanent injunction. We disagree.

"This Court reviews de novo a trial court's decision on a motion for summary disposition in an action seeking declaratory relief." *Mich Alliance for Retired Americans v Secretary of State*, 334 Mich App 238, 252; 964 NW2d 816 (2020). Further, a motion for summary disposition under MCR 2.116(C)(10) tests the factual support for the plaintiff's claims. *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506; 991 NW2d 230 (2022). Summary disposition is appropriate under MCR 2.116(C)(10) when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). In reviewing such a motion, a court considers the pleadings, affidavits, depositions, admissions, and documentary evidence in the light most favorable to the nonmoving party. *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ. *Id*. A trial court may not weigh the evidence, make findings of fact, or make credibility determinations when deciding a motion for summary disposition. *Id*. If there is conflicting evidence before the trial court, summary disposition is not proper. *Id*. at 605-606.

Similarly, "the interpretation of a restrictive covenant is a question of law that this Court reviews de novo." *Eager v Peasley*, 322 Mich App 174, 179; 911 NW2d 470 (2017). This Court also reviews de novo the legal question regarding the nature and scope of property interests arising under a plat dedication. *2000 Baum Family Trust v Babel*, 488 Mich 136, 143; 793 NW2d 633 (2010).

The trial court granted plaintiffs' motion for summary disposition and entered a permanent injunction that, by its practical effect, allowed lot owners within the subdivision to use Charlen Drive for the installation of public utilities. Walby argues that the court's order violated the restrictions found in the 1956 plat dedication. He further submits that the dedication restricted the use of the private roads to ingress and egress and required that all public utilities be installed using the private easements found on the north and south borders of the subdivision. We disagree.

The question before the Court concerns the extent of plaintiffs' right to use Charlen Drive for the installation of their water lines. The resolution of this issue turns on the interpretation of the original 1956 dedication. "When interpreting deeds and plats, Michigan courts seek to effectuate the intent of those who created them." *Tomecek v Bavas*, 482 Mich 484, 490-491; 759 NW2d 178 (2008). Specifically, the scope of a dedication is also governed by the dedicator's intent. *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 100-101; 662 NW2d 387 (2003). Moreover, "where the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted." *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003). Only if the text of a dedication specifying an easement is ambiguous may the trial court consider extrinsic evidence to discern its scope. *Id*.; see also *Dyball v Lennox*, 260 Mich App 698, 704; 680 NW2d 522 (2004).

In 1956, the original dedicators of the Charlen Subdivision included in the dedication, the following:

DEDICATION

KNOW ALL MEN BY THESE PRESENTS, that we . . . as proprietors have caused the land embraced in the annexed plot to be surveyed laid out and platted to be known as "CHARLEN SUBDIVISION" . . . and that US 25 as shown on said plat is hereby dedicated to the use of the public, *and that the private roads and private park indicated on said plat are hereby dedicated to the sole and only use of the lot owners, and that the private easements indicated on said plot are hereby reserved for the use of public utilities and that no permanent structures are to be erected within said easements*. [Emphasis added.]

At the outset, it should be noted that the Charlen Subdivision Plat includes not just the dedication, but also a survey of the property. The survey notes that Charlen Drive is a "66 ft private road." Thus, when considering the intent of the dedication, it is not simply related to the 10-foot-wide drivable portion of the road, but the entire 66-foot-wide portion that is Charlen Drive.

We find that the language of the dedication is clear and unambiguous. It simply provides that the "private roads . . . are dedicated to the sole and only use of the lot owners . . . ." The dedication contains no express prohibition against using Charlen Drive or Florence Court to install public utilities. The plain language of the dedication restricts who may use the private roads, not to what use the private roads may be put. Indeed, the dedication is very broad in this regard. The plain language does not define or restrict the definition of "use." Further, nothing in the plain language of the dedication mandates that all public utilities must be installed using the private 6-foot easements running along the north and south borders of the subdivision. Rather, it is the opposite. The plain language of the dedication restricts the use of the easements to utilities. It does not limit the installation of utilities to the private easements.

From the plain language of the dedication, we conclude that the original dedicators intended the private roads to be for the use of the lot owners, without restricting their use in any way. Indeed, considering the broad language of the dedication, uses beyond ingress and egress, or the installation of utilities, could also be permitted. Thus, the unambiguous language of the plat dedication provided plaintiffs with the unrestricted use of the private road.

The fact that the dedication does not define "use" and also references the private easement for public utilities does not render the language of the dedication ambiguous. A legal instrument is ambiguous when its provisions irreconcilably conflict. *In re Estate of Koch*, 322 Mich App 383, 398; 912 NW2d 205 (2017). In this case, the language addressing the use of the private roads does not conflict with the language addressing the private easement. With very little effort, the provisions can be harmonized because they are not mutually exclusive. That the language of the dedication is very broad suggests that any and all private uses are permitted, including using the Charlen Drive right of way to install public utilities. The private easements are to be used only for public utilities, with no permanent structures to be placed on them, which in no way restricts the potential uses of the roadways. If the dedicators had intended that the private drives not be used

for public utilities and had intended that public utilities be installed only on the private easements, they could have said so.

Moreover, had the dedicators intended to limit the installation of utilities to only the private easements, it seems they would have designed the plat so that the private easements on the north and south borders of the subdivision actually reached Lots 1 through 5, the lots east of Florence Court. It is apparent that the dedicators envisioned that the private roads would be used to facilitate utility installation. This may be gleaned from the plat survey that accompanies the dedication. The 6-foot private easements that are found on the north and south borders of the subdivision run parallel to Charlen Drive, and the easements end at Florence Court. If the private roads could not be used for utility installation it would be impossible to provide utilities to Lots 1 through 5 of the plat, i.e., where plaintiffs' homes are built. Moreover, as noted above, the dedication provides only that the "private roads" are dedicated to the sole use of the lot owners. Charlen Drive, the private road at issue, is 66 feet wide. If the creators intended that the private roads be used by the lot owners solely for ingress and egress, as Walby suggests, there would have been no need to dedicate 66 feet to Charlen Drive. The fact that the dedication included in the definition of Charlen Drive a 66-foot-wide swath, suggests that the creators contemplated the use of Charlen Drive for more than just ingress and egress. Taken together, the language of the dedication and the survey included in the plat provide evidence of intent that the private roads are available for utility installation.

The trial court granted plaintiffs' motion for summary disposition in part because the telephone utility lines were already buried 6 inches under Charlen Drive, Walby had installed his own private water and electrical lines under Charlen Drive, and the north and south private easements did not actually reach plaintiffs' homes on Florence Court. Walby argues that the trial court erred by relying on these considerations when granting plaintiffs' motion for summary disposition. We agree, but find that the court's error does not require reversal. Because the language of the plat dedication was unambiguous, the trial court should not have considered the extraneous evidence. It should have initiated its analysis with a review of the language of the dedication. However, appellate courts will affirm a right result arrived at on the basis of wrong reasoning. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 508-509; 741 NW2d 539 (2007). This is especially the case when this Court's review is de novo. See *Mich Gas & Electric Co v Dowagiac*, 278 Mich 522, 526; 270 NW 772 (1936). A de novo review means that this Court reviews the legal issue independently, without deference to the lower court. *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022).

At the time the circuit court granted plaintiffs' motion for summary disposition and ordered that the injunction be permanent, there remained no genuine issues of material fact that would have precluded the grant of summary disposition under MCR 2.116(C)(10). There is no question of fact that the plain language of the dedication does not preclude a lot owner from using the private roads, specifically Charlen Drive, for the installation of water lines. Therefore, we conclude that the trial court did not err when it granted plaintiffs summary disposition and ordered that a permanent injunction issue.

## B. SUMMARY DISPOSITION-COUNT I

Walby next challenges the trial court's order granting summary disposition with respect to Count I of plaintiffs' complaint. This count requested that the court enter a temporary restraining order or preliminary injunction. Many of Walby's arguments with respect to this issue repeat his position that the trial court erred when it entered a permanent injunction, which we addressed in Part II(A) of this opinion.

Walby appears also to challenge the trial court's entry of a temporary restraining order and preliminary injunction. Walby argues that when seeking a preliminary injunction, plaintiffs asserted that an emergency existed that did not actually exist. Walby also contends that plaintiffs made misrepresentations to the court that there were circumstances preventing them from installing the water lines through the private easements. Walby asserts that Charlen Subdivision had alternate routes for the installation of public utilities, and that plaintiffs' claim that those routes were not usable was unsupported by the record. To the extent that Walby argues that the trial court erred when it entered a preliminary injunction, this argument is moot. An issue becomes moot when "a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy." *GMC v Dep't of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010).

"The objective of a preliminary injunction is to maintain the status quo pending a final hearing regarding the parties' rights." *Alliance for the Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647, 655-656; 588 NW2d 133 (1998). In this case, the trial court granted plaintiffs' request for a preliminary injunction in its September 2, 2020 order. Thereafter, on October 7, 2022, the court granted a permanent injunction. Because a permanent injunction was entered after the court held an evidentiary hearing to determine the parties' rights, and the parties fully briefed the issues, Walby's challenge to the preliminary injunction is moot. *Mich Alliance for Retried Americans*, 334 Mich App at 262-263. Any decision this Court were to make on whether plaintiffs should have been granted a preliminary injunction cannot have a practical legal effect on this controversy. *Id*. Therefore, we decline to consider any issue related to the preliminary injunction.

## C. BENCH TRIAL

Turning to his counterclaim, Walby argues that after the bench trial, the trial court erred when it found no cause of action on his claim that plaintiffs' contractor negligently installed the water lines and that this negligence was a proximate cause of Walby's damages. "Following a bench trial, [this Court] review[s] for clear error the trial court's factual findings and review[s] de novo its conclusions of law." *Lignon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). A trial court's factual finding will be held to be clearly erroneous if not supported by the evidence or if this Court is left with a definite and firm conviction that the trial court made a mistake. *Avery v Michigan*, 345 Mich App 705, 715-716; 9 NW3d 115 (2023). In reviewing a trial court's factual findings, this Court affords great deference to the trial court's superior ability to gauge the credibility and demeanor of the witnesses who appeared before it. *Id*. at 716. Considering the record, we conclude that the trial court did not err.

To establish a claim for negligence, a plaintiff must show that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages,

and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011).

The trial court provided several reasons for finding no cause of action. The first reason was Walby failed to establish that Schweitzer negligently installed the water lines. This finding was not clearly erroneous. The court considered evidence that Schweitzer was an experienced contractor who had installed hundreds of water lines. The court also considered evidence that Schweitzer called "Miss Dig," Michigan's utility notification system, to mark the utilities. Further, Schweitzer explained why he chose to use a certain scoop size, why the size of the trench was warranted, and why he placed the excavated dirt on the road's surface rather than on the road's right of away. The court also found that, contrary to Walby's assertions, the necessary permits were pulled for the project.

The court acknowledged that Walby's private water lines were damaged in the excavation process. It concluded, however, that this was not a consequence of Schweitzer's negligence. This finding was not clearly erroneous. Walby testified that he spray-painted the word "water" near the place where his private water lines were installed. Schweitzer testified that this was noted and that they dug by hand around the water line Walby pointed out to them. However, Schweitzer further testified that about 15 or 20 feet east of this water line, they hit another water line. This water line was not marked with orange, and Walby did not tell them about the water line. Joseph McCoy gave similar testimony that only the unmarked water line was cut and that Schweitzer's crew hand dug and preserved the marked water line. The court also considered evidence that Walby installed his water lines without approval, failed to notify Miss Dig of their presence, failed to mark the water lines, and failed to install trace wire. The court made similar findings regarding the severing of Walby's electrical line. In this regard, the court noted that Walby admitted that he did not disclose the location of the electrical lines to plaintiffs, Schweitzer, or Miss Dig. On the basis of this testimony, the court found that Schweitzer avoided the private utility lines of which he was reasonably aware. Ultimately, the trial court was satisfied that Schweitzer did exercise reasonable care and that damage to Walby's private water and electrical lines was not on account of any negligence on the part of the contractor.

The court also held that the evidence was insufficient to support Walby's claim that Schweitzer damaged the integrity of Charlen Drive during the excavation process. Initially, the court found that the width and depth of the trenches was justified, and it acknowledged that Schweitzer did place the dirt removed from the trenches on the drivable portion of Charlen Drive. However, the court found that the evidence did not support Walby's position that Schweitzer failed to restore Charlen Drive to its preexcavation condition. In particular, the court found that the photographic evidence did not support Walby's claim that before the excavation, the drivable portion of Charlen Drive was flat and level. Instead, the court noted that some "before" pictures showed that there were dips and irregularities in the road. The court also considered testimony that even before the excavation, there were always areas on the road where water gathered.

The court considered evidence related to actions taken to restore the roadway after the excavation. According to the testimony, the McCoys and the Schneiders each expended more than $12,000 to install the water lines, which included restoration of the site. Further, another $2,400 was spent for additional gravel to be placed on the road. The court did not find credible Walby's testimony that before plaintiffs' water line installation, he put several inches of bluestone on the

roadway and that Schweitzer negligently removed this stone. "On appellate review, this Court must afford deference to the trial court's superior ability to judge the credibility of the witnesses who appear before it." *Patel v Patel*, 324 Mich App 631, 633; 922 NW2d 647 (2018.)

Walby's own testimony casts serious doubt on his assertion that Charlen Drive was in very good condition immediately before the excavation in June 2020. Walby admitted that gravel roads require maintenance every three to four years. He further testified that in 2016, he, James, and another neighbor shared the expense of applying 5 inches of Michigan bluestone to the roadway. Walby admitted that after this, he did nothing to maintain the roadway. Accordingly, the court could reasonably conclude that in 2020, four years after the last time the stone was applied to the road, Charlen Drive was likely in need of significant attention even before the excavation for the water lines occurred in June 2020.

The court found the testimony, by Joseph McCoy and James Schneider, that the condition of the road after the installation of the water lines was better than it was before the installation, to be credible. Moreover, the court conducted a site visit and was able to judge the condition of the road at the time of the August 2023 bench trial. On the basis of its observations, the court concluded that the road was properly restored to its preexcavation condition. The court noted that the road "looked good before" and that it was brought back to this condition afterward.

The court also found that Walby failed to mitigate his damages. This finding was supported by the evidence. When Schweitzer struck the lines, he offered to immediately repair them. Walby refused the offer, despite the fact that Schweitzer was a licensed contractor and well-regarded in the community. Further, because Walby refused Schweitzer's offer, and Schweitzer was obligated to fill in the trench because it would not have been prudent to leave an uncovered trench overnight, Walby unnecessarily incurred the expense of having the trench reexcavated when he had the repair work done. Had Walby accepted Schweitzer's offer when the trench was open, he could have later avoided the additional expense of retrenching.

After considering the record, we conclude that the trial court did not err when it found that Walby failed to prove a claim of negligence against plaintiffs on account of the actions of their contractor. The trial court properly entered a judgment of no cause of action on Walby's counterclaim.

Affirmed.

/s/ Michael F. Gadola
/s/ James Robert Redford
/s/ Michelle M. Rick